UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

**REBECCA METZINGER, M.D.,**    **CIVIL ACTION**
                                **NUMBER: 19-10614**
**V.**

**UNITED STATES DEPARTMENT OF**
**VETERANS AFFAIRS, THROUGH ITS**
**SECRETARY**                   **SECTION__**
                                **JUDGE _____**
                                **MAGISTRATE_____**

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

**ORIGINAL COMPLAINT**

**(EQUAL PAY ACT CLAIM)**

NOW INTO COURT, through undersigned counsel, comes plaintiff Rebecca Metzinger, M.D. ("Dr. Metzinger or Plaintiff) a resident of the Parish of Orleans and a person of the full age of majority and states as follows:

1.

**JURISDICTION /FEDERAL QUESTION**

Jurisdiction is proper in this Court as it involves a federal question under 28 U.S.C. 1331 and the United States is a Defendant through the Department of Veterans Affairs. This action is brought under the Equal Pay Act of 1963, 29 U.S.C.206(d).

2.

**VENUE**

Venue is proper in this Court as plaintiff is a resident of the Parish of Orleans, State of Louisiana and employed as a Title 38 physician with the defendant's Veterans Health

Administration facility ("the VA") located in New Orleans Louisiana, Parish of Orleans and the Defendant is a government agency who is subject to suit in this Court.

3.

## PARTIES

**PLAINTIFF:**

Plaintiff, Dr. Rebecca Metzinger, is a Board Certified Opthalmologist (corneal specialist) employed as Chief of Opthalmology at the New Orleans VA hospital.

**DEFENDANT:**

Made Defendant herein is: United States Department of Veteran Affairs (hereafter referred to as the VA, or "the agency") through its Secretary.

## BASIS FOR CLAIM: EQUAL PAY ACT VIOLATION

4.

This is an action filed pursuant to the Equal Pay Act of 1973, 29 U.S.C.206 ("the EPA"). Plaintiff alleges that Dr. Metzinger is receiving and has received less pay than an individual of the opposite sex, while she performs a job requiring equal (or greater) skill, effort and responsibility and which she performs under similar working conditions. Dr. Metzinger is seeking an award of monetary damages, for sex-based wage discrimination, including but not limited to the following, as allowed under the EPA:

1) Back pay based on what Dr. Metzinger would have been entitled to, had she been paid appropriately and in the absence of discrimination based on sex.
2) Interest on that amount as allowed under the EPA
3) Liquidated Damages in an amount equal to the back pay award **as the** agency's actions constituted a willful violation of the EPA**.**
4) Non Pecuniary Damages

5) Future Pecuniary Damages
6) Attorneys Fees
7) Penalties
8) Costs and judicial interest as allowed by law
9) Injunctive Relief, and Declaratory Relief

## TIMELINESS OF THE CLAIM

5.

Dr. Metzinger filed a complaint alleging EPA violations, together with other claims of discrimination, hostile work environment, etc., with the EEOC on June 20, 2017 (which remains pending) after presenting her claim to Human Resources ("HR") at the facility on May 22, 2017 alleging the VA was in violation and she was suffering from sex based wage discrimination. Dr. Metzinger has not received any back pay, despite proof of violation, and demonstrating her entitlement to back pay under the EPA to the VA through the complaint filed and evidence produced during discovery of the pending complaint. The filing of this action is timely as it is being filed within three years of the Defendant Agency's willful violation of the EPA, and also within two years, pleading in the alternative, of any non- willful violation of the EPA.

## GENERAL ALLEGATIONS

6.

On May 22, 2017 Plaintiff advised Darvon Thomas, Human Resources Supervisor at the VA facility, as well as a facility EEO administrator, Karen James, that she wanted to file a complaint based on several issues, *including the fact that she was being paid less than physicians who work under her supervision in her section, who are male.* On June 20, 2017 she filed a complaint alleging *inter alia* wage discrimination based on sex under *both* Title VII *and* as a violation of the EPA. That complaint has been investigated and is pending before the EEOC. Based on this

federal district court complaint being filed, as a matter of law, the EPA based claims of that complaint will be dismissed from the EEOC proceeding so that this suit may proceed.  However the Title VII claims, including those based on sex discrimination resulting in lower wage, will remain pending before the EEOC.  See, *Metzinger v. Robert Wilkie, Secretary, Department of Veteran Affairs, Agency, and EEOC* No **:** 461-2018-00121X.

7.

Dr. Metzinger is a board certified Ophthalmologist,  with a sub specialty in corneal surgery. She was hired to serve as Chief of the Opthalmology Section of the New Orleans based VA hospital, as a Title 38 physician,  on July 6, 2008, the date she entered on duty, and accepted her appointment as a GE 15/1 at a salary of 240,000 dollars..   Dr. Metzinger was hired as a Tier II employee, which refers to her higher level of leadership and administrative responsibilities. Tier II physicians who are also service chiefs as she is --  are entitled to higher pay because of the complexity of their positions.  The regular staff physician and the physicians in her section who she supervises are all Tier 1 employees.  Further, a Tier II physician salary range,  at this time,  for example is 120,000  to 365,000 dollars annually.  A Tier 1 physician salary range in the Ophthalmology Specialty is 104,043 to 348,000 dollars annually. Dr. Metzinger was hired in July 2008 at a wage of 240,000 dollars annually.

8.

On May 22, 2017 Dr. Metzinger was provided a annual performance  evaluation by Nathan Dion, an administrator in the Surgery Section, that classified her performance as "fully successful." with one exception -- she was  given "unacceptable" on the form respecting leadership. This constituted a lower rating than she had received throughout her employment which had been "exceptional" in all categories.

9.

The evaluation was 1) untimely,  2) should have been presented to her by her supervisor, Dr. Smith, Chief of Surgery, not Mr. Dion 3) was not preceded by a mid- year review indicating any problems in her performance, 4) was based on an alleged factor that had not occurred during the fiscal year in question and therefore was not a basis for the assessment as a matter of VA policy and regulation and 5) was without rational or truthful justification.  Because of this and other workplace factors that rose to the level of harassment and hostility towards her by the Chief of Surgery Dr. Smith, and the Chief of Staff, Dr. Metzinger met with Mr. Darvon Thomas, a supervisor at HR. She advised him that the Chief of Surgery had recommended for the September 30, 2016 to October 1 2016  a lesser performance rating than she had received in all of her prior years and the first time she learned of the rating was when  she was  asked by another HR official (Dion)to sign off on this rating that very morning although she had never received any midyear evaluation or conference from her supervisor, the Chief of Surgery Dr. Smith. The only precedent to the evaluation was the fact that the recently arrived Chief of Surgery, Dr. Smith and recently arrived Chief of Staff,  Dr. Schapira had at one point dropped in on Mr. Thomas' office and informed Mr. Thomas  verbally of their view that the Chief of Opthalmology position should go to someone else and Dr. Metzinger  should be removed. When Mr. Thomas told them they needed to document the basis for this, they subsequently took no action.

10.

Neither Mr. Thomas nor any other person in HR nor Dr. Metzinger had ever received any written documentation from any source, indicating  that Dr. Metzinger  was not performing to an acceptable level, or that her performance was in any way not exceptional, as it had been. In addition to reporting other acts of hostility and harassment, by them towards her,  at that time Dr. Metzinger also had a discussion with Mr. Thomas respecting her pay, as she had only  recently

seen some salary numbers for the physicians she supervised and she asked whether as Chief of Section she should be receiving higher pay than her staff physicians she supervised. Mr. Thomas advised her that she should file an EEO complaint, stating that she was entitled to a higher salary than the staff, as she is a Tier II physician and the staff is Tier 1.

11.

Dr. Metzinger filed a EEO claim against the Agency in June 2017. Thereafter Dr. Metzinger, the Chief of Ophthalmology Section, was not permitted to sit as a member of Compensation /Pay Panel reviewing physicians under her, in violation of federal regulations.  Prior to that Dr. Metzinger had been invited to participate as a member in pay panels every year. As of today Dr. Metzinger has not  been invited to participate in  ANY pay panel committees, even with respect to panels convened to evaluate the staff who she supervises as Chief.

12.

Dr. Metzinger also learned that there are four categories of pay that a Title 38 physician may receive, one of which is "Market Pay." Market pay depends recommendations of a compensation panel that is convened for the purposes of performing the market pay review    and whose recommendations must be approved by the Medical Center Director after passing through the Chief of Staff for his concurrence.  Market pay is evaluated bi annually, which means between 2008 and 2018 Dr. Metzinger should have received five market pay compensation panel reviews.

13.

Thereafter Dr. Metzinger obtained, through the EEOC discovery process, salary information, specifically Form SF50's of all the physicians who she supervised,  and learned,  that whereas the Agency had not convened a bi- annual Merit Pay Panel on her behalf  since she was employed in 2008, other physicians, all males, had actually received merit pay panels and market

pay increases during several of those years and they were being paid more than she was although she was the Chief of Section.

14.

Despite receiving "exceptional" in *all* categories of *all* of her annual performance evaluations, for nine years, from 2008, until the evaluation provided to her in May 2017, no market pay panels were ever convened on her behalf. Dr. Metzinger learned that she would have been the subject of FIVE bi annual panels convened from date of her employment had the agency followed the regulations. In fact there had been NONE Dr. Metzinger received no increases for merit or market pay in all of that time. The only pay increase she received was mandatory pay increases -- namely the step increases or the cost of living increases mandated on the basis of longevity..

15.

After she filed her claim, the VA convened, a market panel on her behalf in September 2017. At the time of this panel Dr. Metzinger was receiving Adjusted Basic Pay of 261,045.00 dollars. At the market panel meeting, the panel members stated that Dr. Metzinger was to be awarded nearly 40,000 DOLLARS pay increase at one time, bringing her pay to 300,000 dollars, making her the highest paid in the section effective 2016 when she would have been entitled to a market pay panel. Dr. Metzinger did NOT receive any of the merit pay increase until October 2017. Furthermore she has never received any back pay despite obvious EPA violation. Dr. Metzinger is entitled to back pay under the EPA from at least three years prior to the date of filing of the claim in the EEOC, June 20, 2017.

16.

Dr. Metzinger's file was audited in 2019 by Ms. Debbie Richard, a Assistant Deputy of HR. Ms. Richard determined that the wrong figure was input in the system in 2017 instead of the 300,000 dollars salary she was entitled to. Ms. Richard also determined that Dr. Metzinger should have been given the merit pay panel of 300,000 dollars *from July 2016*, (which would have been the date of her last mandatory bi annual market pay panel, had the agency been convening pay panels on her behalf), and therefore should receive back pay to August 17, 2016. Despite this, Dr. Metzinger has still not received any of that back pay either.

17.

**FACTUAL ALLEGATIONS SUPPORTING WILLFUL VIOLATION OF THE EPA**

FIRST COMPARATOR: DR. DIAMOND:

After Dr. Metzinger filed the EEO claim she requested the wages information respecting other subspecialists. HR responded to written discovery requests for salary information, but did not provide accurate information respecting the other all Tier 1 physicians who she supervised. Instead the numbers were far lower than the actual wages they were receiving. Dr. Diamond, for example is a Tier 1 staff retina specialist who performs very few, less than a dozen surgeries per year, and sees far fewer patient visits than Dr. Metzinger who also has her responsibilities as chief. The VA responded to Dr. Metzinger's Interrogatories stating that Dr. Diamond was hired in 2008 at 235,000 dollars per year. However the truth is Dr. Diamond was quickly increased to a salary of 265,000 dollars in 2009, without any additional responsibilities or leadership role.

18.

Furthermore, as the EEOC claim progressed, Dr. Metzinger learned that in 2009 Dr. Diamond was also given a retention incentive of an additional 35,000 dollars annually for several years even though retention incentives are designed for one year, usually when a facility is being

moved. Dr. Diamond was not legally qualified under the Regulations to receive a retention incentive. Dr. Diamond's retention incentive was still in effect in 2012 because the market panel documents produced on when a panel was convened on his behalf, discusses it. Moreover, Retention incentive must be supported by a bona fide job offer in writing. The VA never produced a retention incentive bona fide job offer. Furthermore, the retention bonus required his service chief' concurrence. Dr. Metzinger was never consulted as to Dr. Diamond's bonus and did not know of it. Although Dr. Metzinger was responsible as "Supervisor" for ensuring that Dr. Diamond was always rated as "fully successful" or higher in order for his retention bonus to remain valid, Dr. Metzinger was never told of Dr. Diamond's retention incentive. The Agency did NOT require a service agreement of Dr. Diamond, and did not meet the requirements of VA Handbook 5007/35 Part VI Appendix Q Nov. 19, 2009.

19.

Documents revealed that Dr. Diamond was making 305,000 dollars per year when Dr. Metzinger was making 261,000 on January, 2017. Dr. Diamond had also received market pay increases whereas Dr. Metzinger received none. Lastly, on September 12, 2016 the Chief of Surgery, Dr. Smith REQUESTED AND convened a market pay compensation panel on behalf of Dr. Diamond. Dr. Diamond received a market pay increase in October of 2016 to from 282,872 to 288,000 and then step increases. Although Dr. Smith requested a market pay increase on behalf of Dr. Diamond, Dr. Smith did NOT request a market pay increase on behalf of Dr. Metzinger. By January 7, 2017 Dr. Diamond was taking home 289,146 dollars. The VA acknowledged that from October, 2016 through September, 2017 Dr. Diamond had only ONE level A surgery and 41 Level B surgeries. Dr. Diamond between September 2107 and October 2018 did only 31 level Bs and only 6 level A surgeries. This is as compared to Dr. Metzinger

who performs hundreds of surgeries annually. Further, most of the operative retina services were contracted out to private physicians outside the VA.  In fact the VA did not have and has not had the facilities to handle retina surgeries on complicated patients. Therefore Dr. Diamond was not even expected to perform retina surgeries

SECOND COMPARATOR: Dr.Vincent.

Dr. Jared Vincent, a male subspecialist is also a Tier 1 staff physician. He was hired on June 1, 2014 at a starting pay of 250, 000 dollars.  Dr. Metzinger, his Chief, and Tier II, was only making 253,000 at that time even though she had been working for the VA as Chief since 2008. Dr. Vincent was suspended and fired in 2017 for misfeasance.

THIRD COMPARATOR: Dr. Carriere

Dr. Carriere is a Tier 1 male staff physician who is not a sub specialist and does not perform surgeries.   In 2016 he was making 256,000 dollars per year as compared with his Chief's 257,234 dollars – despite  all of her additional responsibilities and qualifications as surgeon, and Chief of Section.

20.

FOURTH COMPARATOR: Arley Jaramillo

Dr. Jaramillo began working for the VA as a *fellow*, still in training, not on staff, limited hours,  and he was paid 150,000 dollars. Dr. Jaramillo was not hired as staff until September 23, 2012.  He received a market pay increase from the 149, 013 dollars he was paid while he was a fellow to 247,000 dollars annually. On October 2, 2016  Dr. Jaramillo  received a market pay

increase which made his take home pay 278,335 dollars as a Tier 1 after four years of employment. On October 2, 2016 Dr. Metzinger his supervisor was making 260,599 dollars. By January 8, 2017, Dr. Jaramillo, a Tier 1 physician was taking home $280, 937 dollars;. That was 20,000 dollars MORE than his Tier II Chief, Dr. Metzinger.

21.<br>
<b>DISPARITIES NOT JUSTIFIED BY MERIT SYSTEM</b>

The disparity between Dr. Metzinger's pay and the comparators is not justified by a 1) a merit system; (2) a seniority system; (3) a system which measures earnings by the quantity or quality of production; or (4) a differential based on any factor other than sex, adopted for a legitimate business reason. Dr. Metzinger was primarily responsible for opening the new Eye clinic at the new Orleans VA hospital in 2017 requiring enormous time and skill. The eye clinic under her supervision opened on time. It was immediately functional on the day it was supposed to open. Dr. Metzinger's job as Chief of Section also creates additional duties that the Comparators do NOT perform. She also supervises all of Ophthalmology and Optometry, including providers and health technicians, a program manager and program support assistant. She is responsible for oversight of the eye clinic and all personnel. She must respond to all complaints from our patients and correspond with patients. She oversees the main clinic in New Orleans, a satellite clinic in Baton Rouge, a tele-retinal program, which now runs independently but interacts with the coordinators at times and other tele-health services. She must do mid-year evaluations on employees as well as yearly performance evaluations, maintain files, including insuring all licenses and trainings and competencies are up to date. She conducts the monthly section chief meeting, monthly section meeting. She must approve all leave and sign off on all time cards every other week. She is site director for both LSU and Tulane residents, which consists currently of six (6) residents about to increase to eight (8) residents daily, as well

as Delgado technician students, and optometry students for whom she is responsible. She interacts with pharmacy, logistics, quality, safety and other services to insure that they have all medicines, supplies, instruments and other devices in a safe up to code manner (Joint Commission standards). She is also expected to operate and see patients. She constantly reviews flow and has made multiple process improvements at the VA. She is the ophthalmology liaison to the Operating Room and responsible for the surgical care given and any issues that arise in Operating Room. Dr. Metzinger herself operates in the VA operating room on Mondays and Fridays. She sees patients all day in clinic on Wednesday, for a half day on Thursday and half day on Tuesday. She performs VA administrative work on Tuesday mornings in addition to seeing VA patients. On Mondays and Fridays, after finishing up in the Operating Room she goes back to clinic. On Thursday mornings she performs surgeries at Tulane as part of a cooperative program and Tulane residents come to the VA. Currently she supervises 8 technicians, 3 optometrists, 1 program manager, 1 psa, 8 ophthalmologists in addition to all the residents and students.

22.

### NO EVIDENCE OF MISFEASANCE

The VA has admitted there are *no* documented complaints filed against her by ANY person, physician or otherwise. There is also no evidence whatsoever of any kind of misconduct, malfeasance, neglect, or conduct meriting disciplinary action against Dr. Metzinger. Nor was there any evidence of any disciplinary action, in any of the market panel compensation documents or reports or anywhere in her personnel file.

23.

### DAMAGES

BACK PAY: Plaintiffs is entitled to back pay under the EPA that must be computed to include the pay, allowances and differentials the complainant would have received if the discrimination at issue had not occurred. 5 CFR 550.805 (a)(2). Back pay includes all forms of compensation and reflects fluctuations in working time, overtime rates, penalty overtime, Sunday premium and night work, changing rates of pay, transfers, promotions, and privileges of employment. The Commission also construes "benefits" broadly to include annual leave, sick leave, health insurance, and retirement contributions. EEOC MD-110. Chapter 11. The EEOC states that "'back pay' includes all forms of compensation, and reflects fluctuations in working time, overtime, rates, penalty overtime, Sunday premium and night work, changing rates of pay, transfers, promotions, and privileges of employment. *Grigsby v. U.S. Postal Service*, 102 LRP 15722, EEOC No. 04A10049 (EEOC OFO 2002). When determining the proper amount for a back pay award, the agency must use the average hours worked by employees in the same position and the same pay grade. The average hour calculation should include the average overtime and holiday hours worked by such employees. *Gabriel v. Small Business Administration*, 105 LRP 58298, EEOC No. 01A51987 (EEOC OFO 2005). the EEOC has ordered the agency to recalculate the complainant's back pay award after determining that it failed to include wages he would have received for overtime, and it may have improperly deducted wages he earned at "moonlighting" jobs he might have held even if employed by the agency. *Allen v. Department of the Air Force*, 96 FEOR 3177, EEOC No. 04940006 (EEOC 1996).

24.

In calculating a back pay award, an agency should not automatically reduce it by the amount of any workers' compensation payments received. Instead, the agency should determine what portion of the workers' compensation benefits was intended to compensate for lost wages. The

portion of a workers' compensation award intended as reparation for personal injury should not be deducted from the payment of back wages. *Perez v. U.S. Postal Service*, 105 LRP 10317 , EEOC No. 04A40041 (EEOC OFO 2005).

25.

However, in computing back pay, an agency "shall grant, upon request of an employee, any sick or annual leave available to the employee for a period of incapacitation if the employee can establish that the period of incapacitation was the result of illness or injury." 5 CFR 550.805 (c) and (d).

26.

INTEREST: When interest is payable on a back pay award, interest continues to accrue up until the time the agency actually issues a check for the back pay and interest. For example, in *Meza v. U.S. Postal Service*, EEOC No. 04950025 (EEOC 1996), the EEOC found it was error for the agency to pay interest only until the date of the complainant's reinstatement. Instead, it was obligated to pay interest to the complainant for an additional five months, which is how long it took the agency to issue the actual check for back pay. *Hadley Guide to Federal Sector Equal Employment Law and Practice:* Interest on Back Pay.

27.

ADDITIONAL TAXES: A complainant may be reimbursed for additional taxes stemming from a lump sum back pay award, provided that there is sufficient proof of the loss incurred. *Kloock v. U.S. Postal Service*, 104 LRP 31331 , EEOC No. 04A40012 (EEOC OFO 2004). The EEOC has recognized that an agency is liable for any increased tax liability resulting from receipt of a lump sum of back pay in a single tax year. When an individual receives back pay as a lump sum payment, s/he is entitled to a tax offset payment for the tax year in which the

payment was received. Additionally, the individual will have the burden of establishing the amount of increased federal income tax liability to the agency. EEOC MD-110. Chapter 11. Metzinger the complainant is entitled to a tax offset payment for the agency's lump sum payment for back pay, explaining that the lump sum causes the extra tax liability, not the back pay award itself. *Mohar v. U.S. Postal Service*, 111 LRP 61880 , EEOC No. 0720100019 (EEOC OFO 2011).

28.

ATTORNEYS FEES: Plaintiff is entitled to attorneys fees as an element of damages. If complainant has been represented by an attorney as defined by 29 C.F.R. § 1614.501(e)(1)(iii), he/she is entitled to an award of reasonable attorney's fees incurred in the processing of the complaint. 29 C.F.R. § 1614.501(e). The award of attorney's fees shall be paid by the agency in accordance with 29 C.F.R. § 1614.501 upon receipt of  a  1) Verified Statement of Fees  and  2) case law showing appropriate hourly fee awards  dollars per hour as appropriate for attorneys fees and 3) Certificate of Attorneys Fees providing attorney information and experience.

29.

**TRIAL BY JURY**

Plaintiff is entitled to and requests a trial by jury.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff  Rebecca Metzinger M.D. prays that this Complaint be filed and served on Defendant, and that after due proceedings there be judgment herein in her favor and against Defendant  for monetary damages as set forth herein and all declaratory and injunctive relief as requested in this Complaint and any Amending and Supplementing Complaints filed herein, for

attorneys fees, court costs, litigation expenses and judicial interest and all remedies allowed by law under the Equal Pay Act.

>Respectfully Submitted,
>BY: */s/Marie Riccio Wisner*
>MARIE RICCIO WISNER (#11214)
>LAW OFFICES OF MARIE RICCIO WISNER
>700 CAMP STREET
>NEW ORLEANS, LOUISIANA 70130
>TELEPHONE (504) 528-9500 EXT 239
>FACSIMILE (206) 457-1945
>EMAIL: marie@officericcio.com
>Counsel for Petitioners

## CERTIFICATE OF SERVICE

I hereby certify that on this 21 day of May 2019, I electronically filed the foregoing document with the Clerk of Court by using the CM/ECF system and service will be made as required by law.

>*/s/ Marie RiccioWisner*
>Marie Riccio Wisner